UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X

RUBEN LUCIANO-JIMENEZ,

                           Petitioner,

        -v-

LAWRENCE CATLETTI, et al.,

                       Respondents.

----------------------------------------------------------------------X

26-cv-3546 (LJL)

OPINION AND ORDER

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED:  6/25/2026

**LEWIS J. LIMAN, United States District Judge:**

Ruben Luciano-Jimenez ("Petitioner") petitions, pursuant to 28 U.S.C. § 2241, for a writ of habeas corpus. Dkt. No. 1. For the following reasons, the Court grants Petitioner's request for a hearing.

## BACKGROUND

Petitioner is a 42-year-old citizen of the Dominican Republic who has resided in this country for over 15 years, since 2010. Dkt. No. 1 ("Pet.") ¶¶ 3, 13, 26. He has a daughter and a stepson who are United States citizens. *Id.* ¶ 5.

Petitioner entered the United States without inspection on May 23, 2010 near Hidalgo, Texas. Dkt. No. 26 ¶ 3. He was apprehended by United States Customs and Border Protection and transported to the McAllen Border Patrol Station for processing. *Id.* ¶ 4. He was issued an expedited removal order and subsequently placed in removal proceedings after he established before an immigration officer that he had a credible fear of returning to the Dominican Republic. *Id.* ¶ 5. Petitioner fled to the United States from the Dominican Republic after he was stabbed and beaten for reporting the corrupt behavior of a local political official. Pet. ¶ 27. On January

7, 2014, Petitioner was granted withholding of removal based on the risk of future harm he faces if removed to the Dominican Republic.  *Id.* ¶ 28.

Four years later, on February 23, 2018, Petitioner was convicted in this Court by guilty plea of conspiracy to possess with intent to distribute heroin in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C) based on conduct that occurred in 2016.  *Id.* ¶¶ 6, 29; Dkt. No. 26 ¶ 16.  He was sentenced to 24 months imprisonment and three years of probation.  Pet. ¶ 29; Dkt. No. 26 ¶ 16.

On October 5, 2018, the same day Petitioner completed his prison sentence, he was arrested by Immigration and Customs Enforcement ("ICE") officers and placed in immigration detention.  Pet. ¶¶ 6, 31.  On December 18, 2020, after more than two years in immigration detention without a bond hearing, Petitioner filed a petition for a writ of habeas corpus in the United States District Court for the Middle District of Pennsylvania seeking an individualized bond hearing with certain procedural protections.  *Id.* ¶ 39.  The district court granted that request following a joint stipulation by the parties and ordered that Petitioner be provided an individualized bond hearing before an immigration judge ("IJ") at which the Government would bear the burden of justifying continued detention by clear and convincing evidence.  *Id.* ¶ 40. The IJ denied bond and ordered that detention continue indefinitely, but then-Magistrate Judge Mehalchick issued a report and recommendation concluding that the IJ failed to comply with the court's order and that the bond hearing did not comply with due process.  *Id.* ¶¶ 41–42.

Magistrate Judge Mehalchick then conducted her own bond hearing, where she determined that Petitioner's continued detention violated the Due Process Clause because the Government had failed to meet its burden of proof regarding dangerousness and risk of flight. *Id.* ¶ 43.  She recommended that Petitioner be released, and on July 6, 2021, the district court adopted the report and recommendation in full and ordered Petitioner's release subject to the

2

conditions of supervised release previously imposed in connection with Petitioner's criminal conviction. *Id.* ¶¶ 6, 44; *see Luciano-Jimenez v. Doll*, 547 F. Supp. 3d 462, 463–64 (M.D. Pa. 2021). In total, Petitioner spent more than 32 months in immigration detention before his release in July 2021. Pet. ¶ 6.

Petitioner has obtained no new criminal convictions since his 2018 drug conviction, but he has been arrested several times on charges that have variously been adjourned, dismissed, or otherwise abandoned, with the exception of one charge that was reduced to a municipal noise ordinance violation. *Id.* ¶ 46. In one instance, the charges against Petitioner were adjourned in contemplation of dismissal after video evidence was discovered exculpating him. *Id.* He has completed his three years of supervised release. *Id.* ¶ 45.

On June 19, 2025, ICE officers re-detained Petitioner at his residence pursuant to a warrant. *Id.* ¶¶ 1, 3, 8, 47; Dkt. No. 26 ¶ 48. He received no notice that he was to be arrested. Pet. ¶ 1. He was originally detained at 26 Federal Plaza in New York City but since then has been held at the Orange County Correctional Facility in Goshen, New York. *Id.* ¶¶ 3, 8, 13, 47. Petitioner reports that his physical, mental, and emotional condition has deteriorated at that facility. *Id.* ¶ 85. Recently, he has suffered from heart and blood pressure problems that he did not experience before his detention. *Id.* ¶¶ 50, 85. He has been told that he may need surgery for his eye. *Id.* ¶ 50. He also suffers from depression, anxiety, and debilitating migraines. *Id.* His detention has deprived his family of its primary breadwinner. *Id.* ¶ 51.

Petitioner has been granted relief from removal under the U.N. Convention against Torture ("CAT") by an IJ at least three times. The Board of Immigration Appeals ("BIA") has twice overturned the IJ's grant of relief. First, as previously mentioned, on January 7, 2014, an IJ granted Petitioner withholding of removal based on the risk of future harm he faces if removed

to the Dominican Republic.  *Id.* ¶ 28.  While he was serving his 24-month criminal sentence, the Department of Homeland Security ("DHS") moved to reopen Petitioner's immigration case and terminate his grant of withholding of removal on account of his conviction.  *Id.* ¶ 30.  The IJ granted the motion and terminated withholding of removal.  *Id.*  Petitioner then moved during his first immigration detention for deferral of removal under CAT, which the IJ granted following a hearing on the merits.  *Id.* ¶ 32.  DHS appealed that decision to the BIA, which ordered the case remanded to the IJ for a new decision.  *Id.* ¶ 33.  On remand, the IJ again found that Petitioner had demonstrated entitlement to relief under CAT and granted deferral of removal.  *Id.* ¶ 34. DHS again appealed and, on September 22, 2020, the BIA overturned the IJ's decision again, denied Petitioner's claim for CAT relief, and ordered Petitioner removed to the Dominican Republic.  *Id.* ¶ 35.  Petitioner filed a timely petition for review and motion for entry of a stay of removal to the United States Court of Appeals for the Third Circuit on October 13, 2020.  *Id.* ¶ 36.  The Government then moved to remand the case back to the BIA for a new decision with respect to whether Petitioner met the elements for CAT relief and whether remanding to the IJ would be necessary for further fact finding.  *Id.* ¶ 37.  The Third Circuit granted the motion to remand and vacated the final order of removal.  *Id.* ¶¶ 4, 38.  The BIA remanded the case back to the IJ to determine whether Petitioner's evidence satisfied the criteria for CAT relief.  *Id.* ¶ 4.

Following Petitioner's re-detention on June 25, 2025, venue of Petitioner's immigration proceedings was changed from the York, Pennsylvania non-detained docket to the New York Varick immigration court detained docket.  Dkt. No. 26 ¶ 49.  On July 9, 2025 and July 16, 2025, Petitioner appeared with counsel at master calendar hearings in immigration court to discuss his eligibility for deferral of removal under the regulations implementing CAT and to schedule a merits hearing on that application.  *Id.* ¶ 50.  A merits hearing was held on October 10, 2025 and

4

November 7, 2025.  *Id.* ¶ 51.  On January 12, 2026, the IJ denied Petitioner's application for deferral of removal under CAT and ordered Petitioner removed to the Dominican Republic.  *Id.* ¶ 52.  Petitioner appealed that denial to the BIA and filed his brief on May 7, 2026.  *Id.*  The BIA's decision is pending.  *Id.*  During the hearing on this Petition, no counsel was able to give the Court any estimate as to when the BIA would render a decision.  Petitioner's counsel indicated that he would appeal to the Court of Appeals in the event of an unfavorable decision.

On July 29, 2025, approximately one month after his re-detention, Petitioner filed a motion to enforce in the United States District Court for the Middle District of Pennsylvania on the grounds that his arrest violated the district court's prior habeas order granting his release.  Pet. ¶ 49.  The district court denied that motion and dismissed the case, reasoning in part that it lacked jurisdiction over Petitioner's immediate custodians, who are located in New York.  *See Luciano-Jimenez v. Doll*, 2025 WL 2154368, at *4 (M.D. Pa. July 29, 2025).  The court further explained that it "lack[ed] jurisdiction to review the present detention" because the detention arose "from distinct, subsequent conduct occurring entirely outside this district"—namely, Petitioner's arrests in New York.  *Id.*

**PROCEDURAL HISTORY**

Petitioner filed the instant Petition on April 29, 2026.  Dkt. No. 1.  The Court issued an order to answer the same day.  Dkt. No. 3.  On May 11, 2026, Respondents filed a memorandum of law in opposition to the Petition, along with a habeas return attaching documents and the declaration of Dmitry Rousseau.  Dkt. Nos. 24–26.  On May 18, 2026, Petitioner filed a reply memorandum of law in further support of the Petition.  Dkt. No. 30.  Petitioner also filed the declaration of Richard Frankel on June 8, 2026.  Dkt. No. 32.  The Court held a hearing on the Petition on June 12, 2026, during which the parties presented oral argument.

**DISCUSSION**

Petitioner argues that he is entitled to immediate release because he was not provided notice and a hearing before his bond was revoked and he was re-detained. Pet. ¶¶ 53–73. He also argues that his redetention without cause violates the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (B). *Id.* ¶¶ 74–80. Finally, Petitioner argues in the alternative that because his detention has become unduly prolonged, he is at least entitled to a new bond hearing where the Government bears the burden of proving by clear and convincing evidence that he presents a risk of flight or a danger to the community and that no alternatives to detention can sufficiently mitigate those risks. *Id.* ¶¶ 81–94. Petitioner adds that any such hearing should be conducted by this Court rather than an IJ. *Id.* ¶¶ 95–97. The Court rejects Petitioner's arguments for immediate release without a bond hearing but concludes that Petitioner is entitled to a hearing before this Court.

Respondents maintain that Petitioner is currently detained pursuant to the same statute under which he was previously detained, 8 U.S.C. § 1226(c). Dkt. No. 26 ¶ 53. As relevant here, that law makes detention mandatory for any noncitizen who has been convicted of one of a specified set of crimes, including controlled substances offenses. 8 U.S.C. § 1226(c)(1)(A). The statute "makes no explicit provision for an initial or other bond hearing during the period of detention and places no limit on the duration of detention under its authority." *Black v. Decker*, 103 F.4th 133, 137 (2d Cir. 2024), *cert. granted sub nom.*, *Genalo v. Black*, 2026 WL 1718025 (U.S. June 15, 2026). The Supreme Court upheld Section 1226(c) against constitutional challenge in *Demore v. Kim*, 538 U.S. 510 (2003). The Court concluded that mandatory detention pending removal proceedings without the possibility of bail was permissible for the category of noncitizens with predicate criminal convictions, in part because the period of detention was limited. *Id.* at 517–30. The Court observed that "the detention at stake under

§ 1226(c) lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal." *Id.* at 530. Concurring, Justice Kennedy opined that "since the Due Process Clause prohibits arbitrary deprivations of liberty, a lawful permanent resident . . . could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified." *Id.* at 532 (Kennedy, J., concurring).

In *Black v. Decker*, 103 F.4th 133 (2d Cir. 2024), the Second Circuit held that the Due Process Clause prohibits "unreasonably prolonged detention under section 1226(c) without a bond hearing," and that *Mathews v. Eldrige* provides the appropriate framework for determining the procedural protections due to noncitizens detained under that provision. *Id.* at 138. Applying *Mathews*, the Circuit determined that a noncitizen whose detention has become unreasonably prolonged under Section 1226(c) is entitled to a bond hearing at which the Government bears the burden of proving by clear and convincing evidence that the individual is either a flight risk or a danger to the community, and in setting any bond amount, the noncitizen's ability to pay and alternatives to detention must be considered. *Id.* at 138, 155–59. The Circuit declined to adopt a bright-line rule for when detention becomes unreasonably prolonged, but it observed "that any immigration detention exceeding six months without a bond hearing raises serious due process concerns." *Id.* at 150.

## I.     Petitioner Was Not Entitled to Notice and a Hearing Before Being Re-detained.

Petitioner first argues that he is entitled to immediate release because he was not provided notice or a hearing before his bond was revoked and he was re-detained. Pet. ¶¶ 53–73. He states that because his "prior release was unlawfully revoked, and he has been incarcerated without due process, his immediate release must be ordered until such a time that notice is provided, and a hearing is held to determine whether there are sufficient grounds for revocation

of bond and re-detention." *Id.* ¶ 73.  Petitioner grounds his argument that he was entitled to a pre-revocation bond hearing in (1) his prior order of release issued by the United States District Court for the Middle District of Pennsylvania and (2) due process principles more generally.

At oral argument, the Government conceded that a court which issues an order of release has the authority to enforce that order if the Government re-arrests and re-detains the individual, regardless of whether the court formally specifies in its order that it retains jurisdiction.  That proposition is well supported in the caselaw.  As the Supreme Court explained over 150 years ago: "[T]he rule is universal, that if the power is conferred to render the judgment or enter the decree, it also includes the power to issue proper process to enforce such judgment or decree." *Riggs v. Johnson County*, 73 U.S. (6 Wall.) 166, 187 (1867).  Under this "universal" rule, the Supreme Court has indicated that "even when the original basis for federal jurisdiction no longer exists, such as when diversity has been destroyed or the issue to be litigated is no longer a federal question, the district court that rendered the judgment maintains jurisdiction to hear an action to set that judgment aside."  12 Moore's Federal Practice § 60.84[1][a] (3d ed. 2026) (citing *Pac. R.R. of Mo. v. Mo. Pac. Ry. Co.*, 111 U.S. 505, 522 (1884)).  The result is no different in the habeas context.  "[A] federal court always retains jurisdiction to enforce its lawful judgments, including habeas judgments, [and] the court has the authority to see that its judgment is fully effectuated." *Hechavarria v. Whitaker*, 358 F. Supp. 3d 227, 235 (W.D.N.Y. 2019) (quoting *Gall v. Scroggy*, 603 F.3d 346, 352 (6th Cir. 2010)).  Thus, if a court orders a habeas petitioner released and the Government acts in ways that are either inconsistent with or which serve to frustrate that order, the petitioner may return to the issuing court for relief.

That is what happened here.  Following his redetention, Petitioner filed a motion to enforce judgment in the United States District Court for the Middle District of Pennsylvania.

8

Petitioner contends that because that court declined to rule on that motion and instead demurred on jurisdictional grounds, this Court should now determine compliance with the Pennsylvania court's release order and find that the order required the Government to provide Petitioner with notice and a hearing *before* re-detaining him, which it did not do.  The problem with Petitioner's argument is that the Court disagrees with his reading of the Middle District of Pennsylvania's decision denying his motion to enforce.  Although that court denied Petitioner's motion and, in doing so, invoked jurisdictional language, it also clearly reviewed whether its order had been violated and determined that it had not been.  This Court will not second guess or reevaluate that determination.

In denying Petitioner's motion to enforce, the Middle District of Pennsylvania explained that its prior order of release "did not preclude future re-detention," that "[t]he Government may have lawfully re-detained Petitioner if new circumstances justify such action under § 1226(c)," and that "new circumstances ha[d] clearly arisen" (i.e., Petitioner's arrests since 2021).  *Luciano-Jimenez*, 2025 WL 2154368, at *3–4.  The court stated: "Petitioner's original habeas petition was granted, he was released, and his present detention stems from entirely distinct conduct occurring more than two years later in a different district."  *Id.* at *4.  As such, there was "no ongoing obligation left to enforce," and Petitioner's argument that his detention violated the 2021 release order was "unavailing."  *Id.*  Because the Government's re-detention of Petitioner did not violate the prior release order, the court went on to determine whether it had authority to grant Petitioner new habeas relief.  It concluded that it did not.  Citing "the well-established 'immediate custodian' rule, which requires that habeas petitions challenging present physical custody be brought in the district where the custodian is located," the court reasoned that it lacked jurisdiction to grant Petitioner relief because his immediate custodians were in New York.  *Id.*

9

Thus, although the Middle District of Pennsylvania framed part of its analysis in terms of jurisdiction, it also concluded that Petitioner's re-detention did not violate its prior order of release. Petitioner's renewed argument that the order of release required a pre-deprivation hearing must be rejected.

Petitioner alternatively argues that due process required the Government to provide him notice and a hearing prior to revoking his release. Analogizing to the procedures constitutionally necessary before a state revokes a criminal defendant's probation or parole, *see Morrissey v. Brewer*, 408 U.S. 471, 482 (1972); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973), Petitioner argues that he has a similar constitutionally protected interest in his continued liberty that could only have been curtailed with a pre-deprivation hearing where the Government bore the burden of proving that his re-detention was permissible. Pet. ¶¶ 57, 63, 69. However, surveying *Morrissey*, *Gagnon*, and their progeny, this Court has explained that those cases do not "require process in the form of pre-arrest notice and an opportunity to be heard." *O.F.C. v. Almodovar*, 2026 WL 74262, at *8 (S.D.N.Y. Jan. 9, 2026). Rather, they require: "(1) a prompt and preliminary post-arrest hearing where a neutral adjudicator determines the existence of probable cause of a parole or probation violation; and (2) a final hearing regarding whether such a violation has occurred and whether it justifies final revocation of parole or probation." *Id.* The Court accordingly concluded in *O.F.C.* that a noncitizen released on bond under Section 1226(a) following a period of prolonged detention was not entitled to prior notice and a pre-deprivation hearing before being re-detained where he had committed a new crime while released on bond and an immigration officer exercised individualized discretion in finding that changed circumstances justified re-detention. *Id.* at *7–8. In that circumstance, a prompt post-arrest hearing regarding the justifications for bond revocation sufficed. *Id.* at *12–13.

The due process principles underlying revocation of release for individuals who have previously been subjected to prolonged detention under either Section 1226(a) or Section 1226(c) involve similar—even if not entirely overlapping—considerations.  If anything, those considerations suggest that a pre-deprivation hearing is less necessary in the Section 1226(c) context.  First, the liberty interests of individuals who have been released from detention after a finding that they do not present a flight risk or danger to the community and who have been residing in the United States, forming the "enduring attachments of normal life," are substantial. *O.F.C.*, 2026 WL 74262, at *7, *9–10 (citation omitted).  Second, the risk of erroneous deprivation absent a hearing regarding the basis for revocation of release is high, but "that does not mean that the 'truth-finding process' would be materially advanced by holding a bond revocation hearing before arrest rather than shortly thereafter." *Id.* at *11; *see also id.* ("[T]he probable value of a holding pre-arrest hearing rather than a prompt post-arrest one strikes the Court as far less significant than reallocating the burdens.").[1]  Third, the Government's interests in preventing flight and protecting the community are well established—and those interests deserve particular solicitude in the Section 1226(c) context, where Congress has made findings regarding the flight and danger risks that noncitizens with certain kinds of convictions pose. *See Demore*, 538 U.S. at 518–21 (detailing these congressional findings).  But requiring a prompt post-arrest revocation hearing does "nothing to undercut those interests" and in fact supports

---

[1] Although *O.F.C.* concerned an individual who had been convicted of a crime while released on bond under Section 1226(a), and Petitioner has not been convicted of a crime since his release, that distinction is not dispositive here, as "[w]hile there might be a slightly higher risk of erroneous deprivation (one of the *Mathews* factors) since the crime has been merely alleged, rather than proven, . . . any such deprivation would be short lived" where the noncitizen has "the opportunity—if not released by the agency in the first instance—to make their case as to why the circumstances of the arrest and underlying conduct don't warrant the revocation of their parole." *A.P.A. v. Arteta*, 2026 WL 1587452, at *6 (S.D.N.Y. June 3, 2026).

them by "minimizing the enormous impact of incarceration in cases where it serves no purpose." *Black*, 103 F.4th at 153–54.  On the whole, then, the Court concludes that just as "due process does not require a pre-arrest hearing for noncitizens released on bond" under Section 1226(a), *O.F.C.*, 2026 WL 74262, at \*12, it does not require such a hearing prior to re-detaining noncitizens released under Section 1226(c) following a period of prolonged detention.

**II.      Petitioner's Detention Has Become Unlawfully Prolonged.**

Petitioner next argues that regardless of whether his initial re-detention was lawful, it has become unlawfully prolonged such that he is entitled to a new bond hearing.  Pet. ¶¶ 81–94. Petitioner's argument on this front raises an interesting and (so far as this Court can tell) largely unaddressed question regarding how courts should conceptualize the relationship between multiple separate periods of detention stemming from the same Section 1226(c) predicate conviction.  Petitioner argues that for purposes of the *Black* prolonged detention analysis, his current 12 months of detention should be tacked onto his prior immigration detention of 32 months, as both detentions trace back to the same controlled substances conviction.  In effect, Petitioner contends that the relief articulated in *Black* should not be rendered illusory by permitting the Government to achieve through successive terms of detention that which it could not constitutionally achieve through a single term.  Ultimately, the Court has no occasion to consider this issue, for even assessing Petitioner's second detention in isolation, his detention has become unlawfully prolonged.

*Black* establishes no "bright-line rule as a matter of constitutional law" with respect to when detention becomes unreasonably prolonged, but it notes that "any immigration detention exceeding six months without a bond hearing raises serious due process concerns."  103 F.4th at 150.  As Judge Engelmayer has observed, "lower court decisions in this Circuit—before and after *Black*—have underscored the heightened severity of detention exceeding six months, and in

12

cases under § 1226(c), have been more likely to find a due process violation where detention without a bond hearing has been extended beyond six months." *D.C. v. Noem*, 2026 WL 787895, at *7 (S.D.N.Y. Mar. 20, 2026) (collecting cases).  Petitioner's detention has been twice as long as that which the Second Circuit has said raises serious due process concerns.

The Government agrees that the delays have not been "the product of 'dilatory or bad-faith tactics'" on Petitioner's part.  *See id.* (quoting *J.C.G. v. Genalo*, 2025 WL 88831, at *10 (S.D.N.Y. Jan. 14, 2025)).  Before his current detention, Petitioner was granted CAT relief three times.  Pet. ¶¶ 28–34.  After his current detention began, he promptly sought such relief again. Dkt. No. 26 ¶ 50.  The immigration court, however, took a full five months to complete the merits hearing with respect to Petitioner's application for deferral of removal under CAT.  *Id.* ¶ 51.  And the IJ took an additional two months to render a decision, at that point putting this case firmly beyond the constitutionally suspect six-month period.  *Id.* ¶ 52.  An additional five months have passed since then.  The Government has not been able to offer a reason why the proceedings have drawn on so long, and Petitioner asserted without contradiction at the hearing that appeals before the BIA are backlogged due to a shortage of judges, leaving no real prospect that his detention will soon come to an end.  It thus appears that Petitioner has been held for over a year at this point simply because there are insufficient resources allocated to adjudicate his rights and the rights of those similarly situated.

Application of the *Mathews* factors, as set forth in *Black*, confirms that Petitioner can no longer be held in ICE detention unless the Government proves the need for continued detention by showing that Petitioner presents a flight risk or danger to the community.

The first *Mathews* factor weighs heavily in Petitioner's favor.  "[T]he private interest affected by the official action is the most significant liberty interest there is—the interest in being

free from imprisonment." *Black*, 103 F.4th at 151 (quoting *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020)).  Petitioner's detention has caused "him to be separated from his family, deprived of his work and community, and confined to a county jail" for almost a year.  Pet. ¶ 99.  In jail, Petitioner has experienced health problems including heart and blood pressure problems that he never previously had, depression, anxiety, and migraines.  *Id.* ¶ 85.  His family has been deprived of its primary breadwinner.  *Id.* ¶ 86.  "In approving detention for the pendency of removal proceedings, *Demore* was careful to emphasize the relatively short duration of section 1226(c) detention, stressing data showing that detention under section 1226(c) lasts roughly a month and a half in 85% of cases, and four months where the noncitizen chooses to appeal. . . . Petitioner[] here [has been] detained for far longer, and [his] liberty interest[] more seriously infringed." *Black*, 103 F.4th at 151.

The second *Mathews* factor—the risk of erroneous deprivation through the procedures used and the probable value, if any, of additional or substitute procedural safeguards—also heavily favors Petitioner.  "The only interest to be considered at this part of the *Mathews* analysis is that of the detained individuals—not the government. . . .  Here, the almost nonexistent procedural protections in place for section 1226(c) detainees markedly increased the risk of an erroneous deprivation of Petitioner['s] private liberty interest[]." *Id.* at 152.  The facts of this case underscore that risk.  Although Petitioner's arrests may have initially provided grounds for DHS to reevaluate his release, the charges associated with those arrests have since been dismissed or otherwise dropped with the exception of a single noise ordinance violation.  While confined, Petitioner has had no internal mechanism or procedure to challenge his re-detention other than through a *Joseph* hearing, which would address only whether he has committed a Section 1226(c) predicate and not the issue at the heart of this Petition: whether Petitioner

presents a risk of flight or danger to the community.[2] "In the absence of any meaningful initial procedural safeguards, it appears to us that almost *any* additional procedural safeguards at some point in the detention would add value. The most obvious of these—and that sought by Petitioner[]—would be an individualized bond hearing . . . ." *Id.* at 153.

With respect to the third *Mathews* factor, the Second Circuit has identified "two primary interests" that can support unlimited mandatory detention: "(1) ensuring the noncitizen's appearance at proceedings, and (2) protecting the community from noncitizens who have been involved in crimes that Congress has determined differentiate them from others." *Id.* But, the Second Circuit has held, while these interests may "justify a relatively short-term deprivation of liberty, the balance of interests shifts as the noncitizen's detention is prolonged without any particularized assessment of need." *Id.* at 154. Indeed, requiring "the Government [to] justify continued detention 'promotes the Government's interest—one we believe to be paramount—in minimizing the enormous impact of incarceration in cases where it serves no purpose.' . . . Where the noncitizen poses no danger and is not a flight risk, all the government does in requiring detention is 'separate[] families and remove[] from the community breadwinners, caregivers, parents, siblings and employees.'" *Id.* (quoting *Velasco Lopez*, 978 F.3d at 854–55). To the extent Petitioner's arrests cannot establish his danger or flight risk, his detention "for many months without an individualized assessment . . . serve[s] no public interest." *Id.* "[T]he additional resources that the government will need to expend to justify continued detention at bond hearings will be minimal—and will likely be outweighed by costs saved by reducing unnecessary detention." *Id.* at 155.

---

[2] Petitioner has not asserted, either in a *Joseph* hearing or otherwise, that he falls outside the scope of Section 1226(c) because his prior controlled substances offense does not qualify as a valid predicate.

Accordingly, applying the reasoning of *Black* and *Mathews* to this case, Petitioner's detention has become unreasonably and unlawfully prolonged.

### III.    Remedy

The question remains what process Petitioner is due.  In similar circumstances, courts in this Circuit have routinely ordered hearings before immigration judges where the Government bears the burden of proving by clear and convincing evidence that the noncitizen presents either a danger to the community or a flight risk.  *See D.C.*, 2026 WL 787895, at *11 (collecting cases); *see also Black*, 103 F.4th at 155 (affirming district court's order granting that relief).  With respect to the issue of venue for that hearing, courts have tended to provide little in the way of explanation or analysis for requiring the hearings to occur before IJs.  The courts that have offered some justification have suggested that IJs have the "expertise and experience" necessary to ensure the "efficient resolution of the proceedings consistent with immigration court precedents." *D.C.*, 2026 WL 787895, at *11.  A minority of courts have ordered hearings before the district judge.  Judge Chen has reasoned that while a federal court should defer to the immigration court "with respect to their areas of expertise and jurisdiction," no such deference is appropriate as to issues of constitutional dimension, as "federal courts are the arbiters of constitutional rights such as those at issue in the Petition." *L.G.M. v. LaRocco*, 788 F. Supp. 3d 401, 405 (E.D.N.Y. 2025).

Although this Court has itself previously granted bond hearings before IJs in the Section 1226(a) context, *see, e.g.*, *O.F.C.*, 2026 WL 74262, at *14–15, the Court concludes that the better reasoned approach is for the Court to hold the hearing at which the Government will have the opportunity to justify Petitioner's continued detention.

The Government does not dispute that the Court has the authority to conduct the hearing itself.  As the Second Circuit and Supreme Court have explained, habeas corpus "is an 'adaptable

16

remedy,' the 'precise application and scope' of which changes 'depending upon the circumstances.'" *Velasco Lopez*, 978 F.3d at 855 (quoting *Boumediene v. Bush*, 553 U.S. 723, 779 (2008)). "The 'flexible nature' of habeas relief affords district courts significant discretion over the appropriate remedies for violations of law and the Constitution." *Garcia Lanza v. Noem*, 822 F. Supp. 3d 326, 338 (E.D.N.Y. 2026) (citation omitted). In *Black*, the Second Circuit affirmed the district court's decision to send the case to an IJ for a due process bond hearing. 103 F.4th at 138. But the Circuit did not consider and nowhere indicated that the hearing *had to occur* before the IJ rather than the district court as a matter of due process or otherwise. *Id.* at 147–51. The Circuit simply determined that district court's fashioned remedy was appropriate without addressing the issue of venue. In other cases, courts have concluded that bond hearings are not necessary where it is clear from the record that "the Government could not possibly carry its burden at a bond hearing to show that continued detention is warranted." *Pichardo Sosa v. Warden of Orange Cnty. Corrs.*, 2026 WL 1803814, at *8 (S.D.N.Y. June 23, 2026); *see also W.A.C. v. Rokosky*, 2026 WL 1383150, at *6 (D.N.J. May 18, 2026) ("Where the existing record indicates that the Government could not possibly meet its heightened burden to justify continued detention, release is appropriate."). If a court has the authority to determine based on the record that release is required because the uncontested facts demonstrate that continued detention is not justified, it stands to reason that the court also possesses the authority to take evidence and to determine whether the facts would permit continued detention.

The gravamen of Petitioner's claim here is that his detention has become unreasonably prolonged and that the governmental interests that originally supported that detention are not sufficient to justify its continuation. That claim is of a constitutional dimension, as the Second Circuit recognized in *Black*. It is appropriate that the hearing remedying that constitutional

17

violation take place in front of an Article III court.  "[T]he judiciary [has the] power to verify that detention does in fact have a valid rationale and a 'definite termination point.'"  *Black v. Almodovar*, 156 F.4th 171, 200 (2d Cir. 2025) (Chin and Carney, JJ., statement in support of the denial of rehearing en banc).  While the immigration court may have experience and expertise with respect to immigration court precedents, the purpose of the hearing is not to determine whether Petitioner may continue to be held consistent with BIA precedents or with any other internal administrative rules and procedures, but whether he can continue to be held consistent with the Constitution.  *See O.F.C.*, 2026 WL 74262, at *15 ("The purpose of the bond hearing is to see if the Government can establish by clear and convincing evidence based on changed circumstances that Petitioner presents a danger to the community or a risk of flight, not to see if Petitioner can be detained on some other basis").  The immigration court decidedly does not have expertise or authority over constitutional questions.  *See Villegas ex rel. Guzman Andujar v. Francis*, 815 F. Supp. 3d 248, 264 (S.D.N.Y. 2025) ("Neither an immigration judge nor the BIA has jurisdiction to adjudicate constitutional issues."); *see also Quintanilla v. Decker*, 2021 WL 707062, at *2 (S.D.N.Y. Feb. 22, 2021).  It is the role of an Article III court, not that of any administrative judge, to definitively interpret and apply the Constitution.  "Statutory authorization or not, the Constitution demands that there be a point when detention has gone on so long that courts can no longer blindly trust that it remains justified."  *Black*, 156 F.4th at 200 (Chin and Carney, JJ., statement in support of the denial of rehearing en banc).  Under Section 1226(c), the detention decision is binary.  Either the Government's interests are sufficient to justify detention or they are not.  If the Constitution does not preclude continued detention, Section 1226(c) requires it.  This Court can and should make that constitutional judgment.

18

The reasons that the Government and other courts have sometimes offered for holding these hearings before IJs are unpersuasive.  While IJs frequently conduct bond hearings, the bond hearings that they have most experience with are governed by procedures different than those required here.  *See In re R-A-V-P-*, 27 I. & N. Dec. 803, 804 (BIA 2020) (holding that "[a]n alien requesting a redetermination of his or her custody status under section 236(a) 'must establish to the satisfaction of the Immigration Judge and the Board that he or she does not present a danger to persons or property, is not a threat to the national security, and does not pose a risk of flight'" (citation omitted)); *Hechavarria*, 358 F. Supp. 3d at 239–41 (holding that even where an IJ recited the appropriate burden of proof as ordered by the district court, the IJ nonetheless went on to apply the "typical" standard consistent with the IJ's experience).

Furthermore, this Court also has experience conducting detention hearings, including most frequently where the ultimate question is, as here, whether the Government has established by clear and convincing evidence that the individual presents a danger to the community.  *See United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995) ("To order detention [under the Bail Reform Act], the district court must find, after a hearing, that the government has established the defendant's dangerousness by clear and convincing evidence.").  To the extent that the risk of removal raises questions of non-appearance, the assessment of that risk is also not unfamiliar to a federal district court.  Courts frequently confront that question when the Government argues that bail should be denied both because the defendant faces a criminal sentence and because he faces removal from the country.  If there are other issues distinctive to the immigration context that bear on the Government's interest in continued detention, the Government can educate the Court on those issues just as it would the immigration judge.

19

A direction to the immigration judge to conduct a hearing also cannot be supported by any purported efficiencies.  Although there may have been a time in which immigration courts were able to process "the vast majority" of Section 1226(c) cases within a month and a half, *see Demore*, 538 U.S. at 530, it is clear that they no longer are.  Backlogs in the immigration courts have caused Petitioner's detention to drag on for over a year at this point.  There is no need to add to this backlog by requiring IJs to divert their attention from their normal dockets to conduct additional hearings that this Court itself has the capacity to conduct.

Moreover, at oral argument, the Government could not guarantee that the IJ who has been presiding over Petitioner's immigration proceedings would be the one to conduct the bond hearing, so any efficiencies from an adjudicative-familiarity standpoint are speculative.  *See L.G.M.*, 788 F. Supp. 3d at 406 ("Notably, despite claiming that the 'immigration court is already intimately familiar with the issues relating to L.G.M.,' . . . the Government Respondents do not say that IJ Conroy or any other IJ directly involved in Petitioner's underlying removal proceedings would preside over the bond hearing.").[3]  And it is also not uncommon for district courts, including this one, to review IJ rulings to ensure compliance with conditional habeas orders.  *See Mendoza*, 2026 WL 1470652, at *5 (collecting cases and observing that "numerous courts in this Circuit have ordered petitioners released where the record indicates that immigration judges presiding over new bond hearings have failed to comply with the court-ordered procedures for those hearings").  This added round of litigation and the associated expenses for the parties—not to mention the added weeks or even months of potentially

---

[3] Even if an IJ were familiar with a petitioner's requests for immigration relief, that does not mean the IJ would necessarily be familiar with the circumstances central to the due process hearing.  This fact perhaps explains why IJs who preside over immigration proceedings are not invariably the same ones who conduct court-ordered bond hearings.

unconstitutional infringement on the petitioner's liberty—can be avoided by having the Government present to this Court in the first instance its reasons for continued detention.

As for the process at that bond hearing, the Government indicated at oral argument that if the Court finds detention has become prolonged, it has no opposition to the following procedures: The Government must demonstrate by clear and convincing evidence that Petitioner is a risk of flight or a danger to the community, and the adjudicator must consider alternatives to detention in assessing flight risk and future dangerousness.  In setting any bond amount, the adjudicator must also consider Petitioner's ability to pay.

In its brief in opposition to the Petition, the Government did argue that ability to pay and alternatives to detention should be considered only with respect to flight risk, and not with respect to danger.  Dkt. No. 24 at 14.  The Government backed off that contention at argument, but the Court finds that in any event it is unsound, largely for the reasons provided by Judge Engelmayer in *D.C. v. Noem*, 2026 WL 787895.  In that case, Judge Engelmayer analogized bond in the immigration context to bail determinations in the criminal context, concluding that there was "no sound reason to excise" criminal law's consideration of alternatives to detention in connection with dangerousness from the immigration context.  *Id.* at *12.  After all, in both, even where an individual presents some non-zero risk of danger, less restrictive means might exist which can adequately protect the public.  *Id.*  For example, "'a noncitizen with a history of drunk driving might well pose a serious danger to the community,' but such danger 'would be ameliorated if the noncitizen were released on the condition that he or she not drive a car.'"  *Id.* (quoting *Cantor v. Freden*, 761 F. Supp. 3d 630, 637–38 (W.D.N.Y. 2025)).  This Court agrees with the force of the analogy and with Judge Engelmayer's reasoning.

21

The Court likewise agrees with Judge Engelmayer's conclusion that the Government's contrary position rests on a misreading of *Black*:

> In *Black*, the Circuit reviewed a district court order that, in pertinent part, required the IJ to "consider [p]etitioner's ability to pay and the availability of alternative means of *assuring his appearance*." *See Black v. Decker*, No. 20 Civ. 3055, 2020 WL 4260994, at *9 (S.D.N.Y. July 23, 2020) (emphasis added), *aff'd*, 103 F.4th 133 (2d Cir. 2024). That portion of the order did not concern the IJ's assessment of danger to the community and the Circuit's review of it likewise focused solely on the IJ's assessment of the risk of flight. *See Black*, 103 F.4th at 158. Respondents note that the Circuit, in its discussion, stated that "a showing of dangerousness by clear and convincing evidence would foreclose any possibility of bond," at which point the IJ would have "no reason to consider financial circumstances or alternatives to detention." Opp'n at 13 (quoting *id.* at 159). But that excerpt conveyed merely that, were a noncitizen's dangerousness to require detention, the IJ would have no occasion to consider risk of flight or the associated issues of the noncitizen's financial circumstances or alternatives to detention. Taken in context, it cannot fairly be read to bar an IJ from considering alternatives to detention in assessing whether a noncitizen would present a danger to the community if released. *See Beltran Marroquin*, 2025 WL 3241161, at *4 ("[U]nder *Black*'s own conceptual framework . . . there is no logical reason why the Government's burden on dangerousness should be treated differently than risk of flight, at least when it comes to alternatives to detention.").

*Id.*[4]

## CONCLUSION

For the reasons stated, the Court grants Petitioner's request for a hearing before this Court at which the Government will be required to establish by clear and convincing evidence that Petitioner is either a danger to the community or a flight risk, and that no alternatives to detention exist which might sufficiently mitigate any such risks. The Court will hold the hearing at 9:30 AM on July 10, 2026, in Courtroom 15C of the 500 Pearl Street Courthouse. The parties

---

[4] Petitioner's APA claim argues that his re-detention was arbitrary, capricious, and otherwise not in accordance with law because his arrests "fail to establish by clear and convincing evidence that [he] is a danger or flight risk." Pet. ¶ 78. Whether the Government can establish by clear and convincing evidence that Petitioner is a danger or flight risk is the subject of the hearing that the Court now orders.

are ordered to meet and confer regarding the evidence to be presented at the hearing and to appear at a pre-hearing conference on July 7, 2026, at 3:00 PM in Courtroom 15C.

SO ORDERED.

Dated: June 25, 2026
New York, New York

_____
LEWIS J. LIMAN
United States District Judge